B. F. Crabbe v. Commissioner. Utility Supply Company, Inc. v. Commissioner.
Crabbe v. Commissioner
Docket Nos. 44359, 44360.
United States Tax Court
T.C. Memo 1955-332; 1955 Tax Ct. Memo LEXIS 4; 14 T.C.M. (CCH) 1305; T.C.M. (RIA) 55332; 5 Oil & Gas Rep. 863; December 28, 1955
*4 1. Respondent disallowed portions of the amounts claimed by Utility as traveling and entertainment expenses because of lack of substantiation. Held, on the record herein, respondent's determination is sustained. 2. Utility credited the drawing account of its president, B. F. Crabbe, for various deposits of cash and checks which he made in its bank account and also for various expenditures purportedly made by him on the corporation's behalf. Respondent determined that such credits constituted additional income to Utility. Held, Utility having failed to prove that the deposits of cash and checks were items belonging to Crabbe rather than to itself, and that the expenditures purportedly made on Utility's behalf were, in fact, made, or that they were made from Crabbe's personal funds rather than from the funds of the corporation, respondent's determination that such items constituted additional income to Utility is sustained. 3. Utility claimed a deduction because of the failure of the United States to deliver certain surplus materials which Utility had purchased and paid for. Held, respondent's disallowance of such deduction is sustained since Utility has failed to prove the worthlessness *5 of its claim against the United States. 4. Respondent disallowed a deduction for legal expenses claimed by Utility. This expense was incurred and paid in an attempt to obtain the delivery of the aforementioned surplus materials or to obtain a refund of their purchase price. Held, this expense is deductible as an ordinary and necessary business expense. 5. During the fiscal year ended July 31, 1946, Utility received a $5,000 deposit from a customer to be credited toward the purchase price of certain merchandise. Prior to the end of that taxable year, Utility discovered that it would not be able to deliver the merchandise ordered by this customer. It, accordingly, reversed the bookkeeping entry on its books treating such deposit as income from sales and thereafter treated it as a liability due its customer. No refund was made to the customer because Utility did not have sufficient cash on hand. Respondent determined that this deposit became income to Utility during the fiscal year ended July 31, 1948, on the basis that Utility did not abandon hope of delivering such merchandise until that year. Held, Utility's books accurately reflected this transaction and it resulted in a fixed and *6 continuing liability. 6. Utility paid $3,500 for an interest in an oil well to an individual who had aided it in obtaining financial assistance. Respondent disallowed a $3,500 deduction claimed by Utility on its return for the fiscal year ended July 31, 1948, after the well turned out to be a dry hole during that year. Held, the worthlessness of this investment constitutes a capital loss and did not result in an ordinary and necessary business expense. 7. Crabbe withdrew sums substantially in excess of his salary from Utility and his drawing account on the company's books disclosed a debit balance of $19,775.26 on July 31, 1946. This debit balance increased to $54,837.47 by July 31, 1949. Respondent determined that Crabbe's withdrawals during the calendar years 1946 and 1947 constituted taxable distributions of earnings. Respondent also determined that portions of the amounts received by Crabbe as travel expenses from the corporation constituted additional income to him. In an amended answer, respondent alleged that legal fees in the amount of $2,000 which were paid by Utility in 1947 in the unsuccessful defense of Crabbe in a criminal action, arising out of such officer's activities *7 on behalf of the corporation, constituted additional taxable distributions of earnings to Crabbe. Held, Crabbe has failed to show that his withdrawals were loans at the time they were made and respondent's determination that they constitute taxable distributions of earnings is sustained; held, further, Crabbe has failed to show that amounts received from the corporation purportedly for travel expenses, which were disallowed, were, in fact, so spent and respondent's determination that they constitute additional taxable distributions of earnings is sustained; held, further, respondent has failed to carry his burden of proving that Utility had sufficient earnings and profits at the end of 1947 to support the distribution of a $2,000 taxable dividend to Crabbe and, consequently, his affirmative allegation that the payment of a legal fee for the defense of Crabbe constituted taxable income to Crabbe is denied. 8. Crabbe understated the gross income reported on his return for the taxable year 1946 by more than 25 per cent. Held, the statute of limitations does not bar the assessment and collection of the deficiency determined against Crabbe for that year. Hugh R. Dowling, Esq., 1025 Barnett *8 Building, Jacksonville, Fla., for the petitioners. Lester R. Uretz, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion RICE, Judge: These consolidated proceedings involve deficiencies in income tax and a penalty determined by respondent as follows: Income Tax
Sec. 291(a)
Docket No. 44359
Year
Deficiency
Penalty
B. F. Crabbe
1946
$ 5,183.28
B. F. Crabbe
1947
7,787.65 *
Docket No. 44360
Utility Supply Company, Inc.
FY ended 7/31/47
$ 4,330.25
Utility Supply Company, Inc.
FY ended 7/31/48
21,932.63
Utility Supply Company, Inc.
FY ended 7/31/49
343.91
$85.98
The issues to be decided are: (1) whether respondent properly disallowed portions of the amounts claimed by Utility as deductions for traveling expenses for its fiscal years ended July 31, 1947, July 31, 1948, and July 31, 1949; (2) whether certain amounts credited to the personal account of B. F. Crabbe on the books of Utility, representing various deposits made by Crabbe in Utility's bank account and sums purportedly spent by Crabbe on behalf of the corporation, should have been reported as income by the corporation; (3) whether Utility suffered a deductible loss *9 during the fiscal year ended July 31, 1948, as a result of the refusal of the United States to refund the purchase price paid for certain undelivered surplus property; (4) whether Utility is entitled to a deduction for legal expenses for the fiscal year ended July 31, 1948; (5) whether Utility is required to report a customer's deposit in the amount of $5,000 as income although it treated such deposit as a liability on its books when it found that it could not deliver the merchandise covered by the deposit; (6) whether Utility is entitled to a deduction for an alleged bad debt in the amount of $3,500 for the fiscal year ended July 31, 1948; (7) whether Crabbe received taxable distributions of earnings from Utility during the years 1946 and 1947 as a result of his withdrawals of cash substantially in excess of his salary during those years and, also, as a result of the receipt of alleged travel expenses from Utility; and, further, by reason of the payment of certain legal fees on his behalf by Utility; and (8) whether the statute of limitations bars the assessment and collection of the deficiency determined against Crabbe for the taxable year 1946. Certain other issues raised by the *10 pleadings have been conceded and will be taken into account under a Rule 50 computation. In his deficiency notice, respondent disallowed a portion of the medical expenses claimed as a deduction by Crabbe for the year 1946 in order to limit the deduction to that amount which exceeds 5 per cent of Crabbe's adjusted gross income. Adjustment will be made under the Rule 50 computation to permit the deduction of medical expenses in accordance with Crabbe's adjusted gross income as found herein. An issue was raised in the pleadings by Utility with respect to whether the Form 1120 filed by it for the fiscal year ended July 31, 1947, was a sufficient return to start the running of the statute of limitations and thus bar the assessment and collection of the deficiency asserted against it for that fiscal year. However, since such issue was not argued by Utility at the hearing or on brief, it is deemed to have been waived. Utility also raised an issue in its petition regarding the penalty determined by respondent under section 291(a) for the failure to file the return for the fiscal year ended July 31, 1949, within the time required by the Code. Since no evidence was introduced to show that the *11 filing of Utility's alleged return approximately 8 1/2 months after the due date was due to reasonable cause and not to willful neglect, and since this issue was not argued on brief, it is also deemed to have been waived. General Findings of Fact B. F. Crabbe (hereinafter referred to as Crabbe) resided in Birmingham, Alabama, during 1946 and 1947. He filed individual income tax returns for such calendar years with the collector of internal revenue for the district of Alabama. Utility Supply Company, Inc. (hereinafter referred to as Utility), is a corporation organized and existing under the laws of the State of Alabama. During the fiscal years ended July 31, 1947 and July 31, 1948, it maintained its principal office at Birmingham, Alabama. Sometime during the fiscal year ended July 31, 1949, it moved its principal office to Orlando, Florida. Utility filed copies of Form 1120, Corporation Income Tax Return, with the collector of internal revenue for the district of Alabama for its fiscal years ended July 31, 1947, July 31, 1948, and July 31, 1949. Although these alleged returns were signed and sworn to only by Crabbe, the president of Utility, and were not signed or sworn to by the *12 treasurer, assistant treasurer or chief accounting officer of the corporation as required by section 52(a) of the 1939 Code, for convenience, they will be referred to hereinafter as the "returns" of the corporation. Prior to 1943, Crabbe had been a salesman and, subsequently, a sales manager, for a company manufacturing cast iron pipe. Desiring to go into business for himself, he left this company in 1943 and organized Utility. Utility was incorporated on July 29, 1943, its purpose being to engage in the purchase and sale of water and sewerage treatment supplies. The original subscriptions to its capital stock were as follows: No. of Shares
Name
Address
Par Value- $100 Per Share
Ben F. Crabbe
Birmingham, Alabama
24
Martha B. Crabbe
Birmingham, Alabama
35
Maxwell Crabbe
Birmingham, Alabama
1
Elizabeth R. Crabbe
Birmingham, Alabama
10 Martha B. Crabbe, Maxwell Crabbe, and Elizabeth R. Crabbe are, respectively, the wife, brother, and mother of B. F. Crabbe. Crabbe obtained financial assistance in the organization of Utility from one J. E. Milam (hereinafter sometimes referred to as Milam). Milam agreed to purchase 35 shares of Utility's capital stock for $3,500, but did not wish his investment to appear *13 on the records of the company since he was a waterworks and sewerage contractor, competing with other potential customers of Utility. Accordingly, shortly after the incorporation of Utility, Crabbe's wife, Martha B. Crabbe, transferred to Milam the 35 shares of stock which she had subscribed to, and Milam paid $3,500 to Utility. Crabbe has been the president of Utility since its incorporation. He was the only active officer of the company and had complete control and management of the company's activities during the years here in issue. Sometime during the fiscal year ended July 31, 1949, the activities of Utility were greatly diminished and it ceased to do business. Utility used the accrual system of accounting in its books and income tax returns. Its books and records were maintained by an independent public accountant at his office in Birmingham, Alabama, on the basis of records, check stubs, and other information furnished him by Crabbe. Because of Crabbe's frequent absences from Birmingham, the accountant would often receive data to be recorded in the company's books several months after the actual transaction had transpired. The public accountant employed by Utility performed *14 a similar service for a number of other firms. Issue 1: Traveling and Entertainment Expenses Findings of Fact During the taxable years in issue, Utility was in the business of selling waterworks and sewerage materials and equipmet in the states of Kentucky, Tennessee, North Carolina, South Carolina, Georgia, Alabama, and Florida. In connection with the business of Utility, it was necessary for Crabbe to visit and entertain prospective customers in these states. Personal contact with contractors who used the various items sold by Utility was essential in this type of business. Crabbe's wife, Martha B. Crabbe, accompanied him on business trips during the years 1946 to 1949, inclusive, on an average of five or six times a year. She was not an employee of Utility and knew nothing about the pipe business, but sometimes helped her husband entertain prospective customers. Approximately $300 to $600 of the amount claimed as travel expense each year by Utility represented payments of expenses incurred by Crabbe's wife while accompanying him on business trips. Crabbe, as president of Utility, considered the amounts which were spent by the corporation for his wife's travel expenses to have been *15 well spent in the interests of Utility. On one occasion, Crabbe's brother, Maxwell Crabbe, accompanied him on a business trip. Crabbe paid all of his brother's expenses on that trip. Maxwell Crabbe did not participate in the business of Utility in any way. The traveling and entertainment expense entries on the books of Utility were, in most instances, not made from the actual records of such expenditures, but were made by its accountant from check stubs furnished by Crabbe, upon which he had written the notation "travel." The majority of the check stubs bearing the notation "travel" indicated that the checks had been made payable to cash. Some of the remaining check stubs indicated that the checks had been made payable to hotels, air lines, and railroads. Crabbe retained certain of the original vouchers and paid bills substantiating his traveling and entertainment expenditures at the office of Utility, but many of these original records were lost in 1948 when Utility closed its office in Birmingham. The only remaining original records of Crabbe's traveling expenses during the years in question consisted of paid hotel bills for the years 1947 and 1948 in the respective amounts of $198.50 *16 and $334.56. Respondent determined that because of Utility's failure to substantiate its claimed travel and entertainment expenses for the fiscal years ended July 31, 1947, July 31, 1948, and July 31, 1949, only approximately 50, 43, and 41 per cent, respectively, of the deductions claimed for these years could be allowed. Set forth below are the amounts claimed by Utility as traveling and entertainment expenses on its returns for such years together with the amounts allowed by respondent as deductions: Travel and
Travel and
Entertainment
Entertainment
Expense Claimed
Expense Allowed
Fiscal Year ended 7/31/47
$10,154.05
$5,075.53
Fiscal Year ended 7/31/48
8,754.59
3,754.59
Fiscal Year ended 7/31/49
2,417.25
1,000.00
Opinion Because of lack of substantiation, respondent has allowed but approximately 50, 43, and 41 per cent of the traveling and entertainment expense deductions claimed by Utility for its three fiscal years here in issue. The entries on the corporation's books for these expenses were not made, in most instances, from the actual vouchers and records of such expenditures, but were made solely on the basis of check stubs furnished by Crabbe to the corporation's accountant. Although some *17 of these stubs indicated that the checks had been made payable to hotels, air lines, and railroads, the vast majority of them, both in number and dollar amount, simply bore the notation "travel" and indicated that the checks had been drawn to cash by Crabbe, the corporation's president and only active officer. Regulations 111, Section 29.23(a)-2(c), referring to deductions for traveling and entertainment expenses, provides that "claim for the deductions referred to herein must be substantiated, when required by the Commissioner, by evidence showing in detail the amount and nature of the expenses incurred." The only substantiating evidence which was introduced, other than the testimony of Crabbe and Utility's accountant, consisted of hotel bills for the years 1947 and 1948 in the aggregate amounts of $198.50 and $334.56, respectively. Crabbe and the accountant testified that Utility had possessed vouchers supporting most of the claimed expenditures, but that most of such substantiating evidence had been lost when Crabbe closed Utility's Birmingham office and moved to Florida. However, since the entries were made principally on the basis of check stubs bearing the bare notation "travel," *18 and since most of such checks were drawn to cash, it is clear that Utility's accountant was in no position to verify that these expenses were, in fact, incurred. In order to show that checks drawn to cash, and substantiated only by the bare notation "travel" on the check stub, represented amounts spent for travel and entertainment on behalf of the corporation, some attempt to reconstruct these purported expenditures should have been made. Since no evidence was introduced as to the number of trips made, the duration of such trips, and the approximate amount spent on a per diem basis, [1] we cannot say that respondent's determination was erroneous. Moreover, it appears that a part of these claimed expenditures were made in order to defray the traveling expenses of Crabbe's wife; and that, in one instance, Crabbe paid the expenses of his brother when the latter accompanied him on one of his trips. Neither Crabbe's wife nor brother were employees of the corporation. Any services which Mrs. Crabbe may have rendered in assisting her husband in entertaining his customers were no more than any interested wife would render under the circumstances. Mrs. *19 Crabbe's traveling expenses were not "ordinary" expenses within the meaning of section 23(a) of the 1939 Code. Cf. Deputy v. Du Pont, 308 U.S. 488 (1940). No claim has been made that Crabbe's brother performed any services for the corporation and any benefit which the corporation may have received from Mrs. Crabbe's efforts is entirely nebulous. We must, therefore, consider the corporation funds which Crabbe spent on traveling expenses for his wife and brother as his personal expenditures and nondeductible by Utility. On the basis of the record herein, we think the amounts which respondent has allowed Utility for traveling and entertainment expenses to be entirely reasonable and in line with the rule of Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930). Issue 2: Unidentified Credits Findings of Fact During each of the three fiscal years involved, Crabbe deposited various checks and sums of money in Utility's bank account indicating on the duplicate deposit slips, which were prepared for the use of Utility's accountant, that such deposits should be entered on the corporation's books as credits to his drawing account. The accountant duly credited these deposits to Crabbe's drawing *20 account, thus treating these deposits as having originated from Crabbe's personal funds. Sometime during the fiscal year ended July 31, 1949, Crabbe moved to Orlando, Florida. At various intervals, he forwarded to Utility's accountant schedules purportedly listing accounts receivable which he had collected for Utility and various expenditures and payments which he made on its behalf. One such schedule, dated January 20, 1949, lists receipts totaling $2,906.53 and expenditures of $2,400.09. Another schedule sent by Crabbe to Utility's accountant indicated payments by him on the corporation's behalf aggregating $4,864.37, and collections of accounts receivable for Utility in the total amount of $5,062.62. Utility's accountant entered these items on the corporation's books and credited Crabbe's drawing account with the aggregate amount indicated as having been spent by him on the corporation's behalf. In addition, he received further schedules from Crabbe, indicating that Crabbe had spent the amount of $113.00, $260.00, $81.00, and $124.20 on the corporation's behalf. These amounts were also credited to Crabbe's drawing account on the corporation's books. Crabbe did not furnish Utility's *21 accountant with vouchers or other supporting records to substantiate the making of the various expenditures listed on the aforementioned schedules. Respondent determined that certain of these "unidentified credits" (as he terms them) to Crabbe's drawing account represented amounts which should have been reported as income by the corporation. Set forth below are the aggregate amounts of such credits originally placed in issue, those which have since been conceded by the respondent as not constituting income to Utility, the aggregate amounts conceded by Utility as constituting income to itself rather than a credit to Crabbe's drawing account, and the aggregate amounts of such credits still in issue: Credits
Credits
Credits
Credits
Originally
Conceded By
Conceded By
Remaining
In Issue
Respondent
Petitioner
In Issue
FY Ended 7/31/47
$10,029.90
$8,899.90
$ 130.00
$1,000.00
FY Ended 7/31/48
3,147.16
170.13
2,825.78
151.25
FY Ended 7/31/49
9,092.60
1,000.00
0
8,092.60 The individual items remaining in controversy, as designated on the deposit slips and memoranda prepared by Crabbe for the accountant's use, are as follows: Date
Description
Amount
Fiscal Year Ended July 31, 1947
7/21/47
Deposit
B. F. Crabbe
$ 500.00
Undated
Loan to Max Crabbe
500.00
Fiscal Year Ended July 31, 1948
12/24/47
Deposit
G. R. Kavanaugh
$ 31.25
1/ 5/48
Deposit
Undesignated
120.00
Fiscal Year Ended July 31, 1949
8/16/48
Deposit
Owens Cont. Co.
149.94
9/15/48
Deposit
Undesignated
100.00
Undated
Expenses paid by B. F. Crabbe
2,400.09
Undated
Expenses, etc., paid by B. F. Crabbe
4,864.37
Undated
A. P. Paid by B. F. Crabbe
113.00
Undated
A. P. Paid by B. F. Crabbe
260.00
Undated
A. P. Paid by B. F. Crabbe
81.00
Undated
A. P. Paid by B. F. Crabbe
124.20
Opinion *22 This issue presents the problem of whether various credits to Crabbe's personal account on the corporation's books should be regarded as additional income to the corporation. These various credits arose from two basically different series of transactions and each will be discussed separately. The first group of credits represents five deposits made by Crabbe in the corporation's bank account. These deposits consisted of both checks and sums of cash, and aggregated $901.19. To overcome respondent's determination that these "unidentified credits" should properly have been reported as income by it, the corporation must prove that the deposits of cash and checks were, in each instance, deposits of sums belonging to Crabbe rather than to itself. The only proof introduced by Utility on this matter consisted of Crabbe's vague, self-serving testimony that, insofar as he could recall, these sums belonged to him rather than the corporation. However, entries made by Crabbe on the deposit slips with respect to certain of the checks deposited by him indicate that they were issued by individuals or firms which might have been customers of the corporation. They thus give support to respondent's determination *23 that such deposits were deposits of corporate income resulting from the performance of services or the sale of merchandise by the corporation. Lacking any evidence, other than Crabbe's inadequate testimony, to identify these deposits as originating from Crabbe's personal funds, respondent's determination that they constituted corporate income is sustained. The remaining items in dispute under this issue consist of 7 entries on the books of Utility crediting Crabbe's drawing account in the aggregate amount of $8,342.66 for various corporate expenses purportedly paid by him out of his personal funds. One of such entries relates to the repayment of a. personal loan to Crabbe, which he allegedly applied to the corporation's benefit rather than collecting it in cash for himself. However, the evidence with respect to this item is inconsistent and insufficient to overcome respondent's determination that it resulted in additional income to Utility. The remaining 6 entries were made on the corporation's books by its accountant on the basis of various schedules mailed to him by Crabbe, who was then living in Florida. No vouchers or other substantiating evidence were submitted to the accountant *24 to prove that these purported expenditures were, in fact, made. Except for Crabbe's self-serving testimony, there is no evidence in the record to show that such expenditures were made and, if made, that they were made out of Crabbe's personal funds rather than funds of the corporation. Respondent's determination with respect to these items must, accordingly, be sustained. Issues 3 and 4: Loss and Legal Expenses re Undelivered Purchases Findings of Fact On March 16, 1946 and March 26, 1946, Utility made purchases of certain surplus property from the War Assets Corporation, an agency of the United States, at an aggregate cost of $31,745.44. This sum was duly paid and shipments accounting for $8,088.44 of the total purchase price were delivered to Utility. On April 25, 1946, the War Assets Administration, successor agency to the War Assets Corporation, wrote to Crabbe stating that it would make no further shipments of surplus property which had been purchased by Utility. Sometime during 1946 or 1947, Crabbe and several other individuals were indicted by the Federal Grand Jury in the District Court of the United States for the Western District of Kentucky for conspiring to defraud the *25 United States. This indictment charged them with conspiring "to defraud the United States by depriving it of its right to have the lawful functions of the * * * War Assets Corporation * * * exercised and administered free from corruption, fraud and obstruction * * *." The indictment alleged that Crabbe had paid $1,150 to an employee of the War Assets Corporation and that he and the other defendants had conspired to receive information from employees of the War Assets Corporation pertaining to prices offered by others on competitive bids and to be favored in sales of surplus Government property. Crabbe entered a plea of nolo contendere to the above charges and was fined $10,000. Utility made repeated attempts to have the War Assets Administration deliver the balance of the materials which it had purchased and paid for or else to return the purchase price of such materials. A law firm was employed by Utility to assist it in its negotiations with the War Assets Administration and also to defend Crabbe against the indictment which had been issued against him individually. Sometime during its fiscal year ended July 31, 1948, this law firm advised Utility that neither the materials nor the *26 money could be recovered. Utility charged off the cost of the unshipped materials on its books and claimed it as a deduction on its income tax return for that fiscal year. Utility paid this law firm the sum of $2,000 for handling the indictment and subsequent proceedings involving Crabbe and an additional $3,526.09 for its services in attempting to recover the surplus materials or their purchase price. In 1950, Crabbe related the matter to another attorney who advised him to file suit in the United States Court of Claims for recovery of the purchase price of the unshipped materials. Suit was filed against the United States in the United States Court of Claims in 1952, naming Crabbe and Utility as plaintiffs. In an Answer and Counterclaim filed on March 26, 1953, the United States admitted that the balance of the purchase price paid by Utility for certain surplus property had not been refunded, but denied that it had illegally deprived the company of the money paid for such property. In addition, the United States in a counterclaim made pursuant to Section 26(b) of the Surplus Property Act of 1944 [Act of October 3, 1944, Ch. 479, sec. 26, 58 Stat. 780], alleged that Crabbe and Utility *27 are liable to the United States in the sum of $66,000 plus double the amount of damage sustained by reason of certain fraudulent acts committed by the plaintiffs in connection with the purchase and sale of surplus property. The action was still pending before the United States Court of Claims at the time of the hearing herein. Respondent determined that Utility was not entitled to a deduction for the $23,657 purchase price of surplus materials which had not been delivered to it, and, further, that the $3,526.09 in legal expenses was not deductible because such "legal expense was incurred in an unsuccessful defense of an illegal act." Utility's claim against the United States for the delivery of certain surplus materials or the refund of the purchase price thereof did not become worthless during its fiscal year ended July 31, 1948. Opinion Utility contends that it is entitled to a deduction in its fiscal year ended July 31, 1948, for the cost of certain surplus materials which it purchased and paid for, but which have neither been delivered to it nor been made the subject of a refund by the seller. Although Utility does not state the statutory basis of its claimed deduction, we assume *28 that it relies on section 23(f) of the 1939 Code, [2] applicable to losses incurred by corporations. Certainly, this was no bad debt since there was no debtorcreditor relationship and Utility's claim against the seller must be one based upon breach of contract. To be entitled to a deduction under section 23(f), a taxpayer must show both the fact of worthlessness and the year in which such worthlessness occurred. The subjective test of worthlessness, that is, the taxpayer's reasonable and honest belief, supported by his acts and conduct cannot be the sole and controlling criterion of deductibility for income tax purposes. Boehm v. Commissioner, 326 U.S. 287 (1945). The Code speaks in terms of "losses sustained during the taxable year" and this requires a finding of fact based upon a practical consideration of all the relevant facts, both subjective and objective in nature. In the instant case, Utility claimed a deduction in its *29 fiscal year ended July 31, 1948, on the advice of counsel, given in that fiscal year, that its claim against the Government could not be considered collectible. Yet, two years later, it was advised by other counsel that a valid claim existed, suit was instituted, and, at the time of the hearing herein, the case was proceeding to trial on its merits in the United States Court of Claims. Obviously, the taxpayer and its present counsel have reviewed the facts of the case and now believe the claim to be a valid and valuable one. It may be that Utility will yet recover the purchase price of the undelivered materials. We must regard the views of Utility and those of its counsel in 1948 as a subjective appraisal of the situation which has since been reversed and, upon this state of the record, must hold that Utility has failed to carry its burden of proving that it sustained a deductible loss in 1948. See Lewellyn v. Elec. Reduction Co., 275 U.S. 243 (1927). Respondent determined, in his statutory notice of deficiency, that the $3,526.09 in legal expenses incurred by Utility was not deductible because such "legal expense was incurred in an unsuccessful defense of an illegal act." The record *30 clearly establishes that Utility was neither indicted nor convicted of illegal acts, and respondent no longer presses that contention. However, he now argues, on brief, that Utility failed to prove by documentary evidence that it incurred and paid the claimed legal expenses. The testimony with regard to this expense was clear and convincing and our finding that this expense was incurred and paid in an attempt to obtain delivery of the surplus materials or to recover their purchase price is dispositive of this issue. These legal fees had a direct relationship to the business activities of Utility and it is entitled to deduct them as ordinary and necessary business expenses for its fiscal year ended July 31, 1948. See Kornhauser v. United States, 276 U.S. 145 (1928). Issue 5: Deposit on Cancelled Sale Findings of Fact Sometime during the fiscal year ended July 31, 1946, the Valley Steel Products Company paid $5,000 to Utility as a deposit on the purchase of certain war surplus materials which Utility had, in turn, purchased from the United States. As a result of the refusal by the United States to ship the surplus property in question to Utility, delivery was never made to the Valley *31 Steel Products Company. The latter company made repeated demands that Utility refund the $5,000, but Utility was unable to do so because of insufficient funds. The deposit had not yet been refunded at the time of the hearing herein. Utility originally treated the $5,000 deposit as partial proceeds from a sale, debiting the cash account and crediting the sales account on its books. After it had been determined that this merchandise could not be delivered, this sales entry was reversed on July 31, 1946, and the $5,000 deposit was treated as a liability owing to the Valley Steel Products Company. Respondent determined that the $5,000 deposit constituted income from sales earned by Utility during its fiscal year ended July 31, 1948. Opinion Respondent contends that sometime during its fiscal year ended July 31, 1948, Utility abandoned all hope of being able to deliver the merchandise purchased by the Valley Steel Products Company and that, accordingly, the $5,000 deposit which had been received on this order constituted income to Utility at that time. However, the record clearly establishes that Utility considered the order to be cancelled once it realized that it would not be able to *32 obtain the promised merchandise within the near future. It arrived at this decision prior to July 31, 1946, and it thereafter treated the $5,000 deposit as a liability which would be refunded when sufficient funds were available. The proper book entries were made by Utility, prior to July 31, 1946, reversing the sales entry and disclosing the liability to refund the deposit. This record cannot support a finding that the purchaser has forgiven the indebtedness owed it by Utility, and we can see no basis for respondent's determination that this deposit should be treated as income by Utility during its fiscal year ended July 31, 1948. Issue 6: Bad Debt Findings of Fact Sometime during its fiscal year ended July 31, 1948, Crabbe promised a Mr. Dalton, who was then engaged in drilling an oil well, that he would purchase an interest in the well if Dalton would aid Utility in obtaining the financial assistance of a certain other individual for one of the business ventures in which Utility was then engaged. Dalton did aid Utility in obtaining the financial help of this third party and Utility's venture proved to be successful. Utility then paid $3,500 for an interest in Dalton's oil well. *33 At the time of this purchase, Crabbe believed that there were good chances that the well would prove to be a profitable investment. The well turned out to be a dry hole and was abandoned prior to July 31, 1948. On its return for the fiscal year ended July 31, 1948, Utility claimed a $3,500 bad debt deduction with respect to this transaction. Respondent disallowed this deduction on the basis that the purported bad debt was not shown to be incurred in Utility's trade or business and, further, that Utility had not shown it to have become worthless in the year the deduction was claimed. Opinion On brief, Utility abandons the claim that the failure of the well drilling operation and the loss of its investment resulted in a bad debt. It now claims the deduction as an ordinary and necessary business expense under the theory of Commissioner v. Bagley & Sewall Co., 221 Fed. (2d) 944 (C.A. 2, 1955), affirming 20 T.C. 983 (1953). However, though the purchase may have been prompted by the desire to render financial assistance to the operator of the well in return for the services which he had rendered to Utility, it is clear that the interest thus acquired was regarded as an investment and was *34 to be held as such in the hope of future gain. The instant situation is thus clearly distinguishable from Commissioner v. Bagley & Sewall Co., supra. In that case, a taxpayer was required to deposit United States Government bonds as security for the performance of a contract. The taxpayer purchased the bonds and they were placed in escrow, but when they were released upon performance of the contract, they were sold within a few days at a loss. It was held that this loss was deductible as an ordinary and necessary business expense since the bonds had not been purchased as an investment but as an integral part of a business transaction and, therefore, were not capital assets. Here, Utility purchased and held an interest in an oil well as an investment and though the acquisition of this investment may have been motivated by reasons related to its business, the nature of the asset and the manner in which it was held require that any loss incident thereto be treated as a capital loss and not as an ordinary and necessary business expense. Exposition Souvenir Corp. v. Commissioner, 163 Fed. (2d) 283 (C.A. 2, 1947). Issue 7: Dividends - B. F. Crabbe Findings of Fact During the years 1946 *35 and 1947, Crabbe received a salary in the respective amounts of $3,900 and $12,500 from Utility. This salary was credited to his drawing account on the corporation's books and withdrawals for various personal and living expenses were charged against this account. Crabbe's withdrawals were substantially in excess of his salary, and his drawing account disclosed a large debit balance due the corporation at the end of each of its fiscal years here in issue. The drawing account was credited with certain expenditures which Crabbe made on the corporation's behalf out of his personal funds, aggregating at least $8,899.90 in the fiscal year ended July 31, 1947, at least $170.13 in the fiscal year ended July 31, 1948, and at least $1,000.00 in the fiscal year ended July 31, 1949. During the calendar year 1951, Crabbe paid various corporate obligations aggregating $5,777.23. Crabbe obtained part of the funds for such payments from the sale of various parcels of real property which he owned. Despite these credits, the amount of his withdrawals was such that the debit balance in the drawing account increased from $19,775.26 on July 31, 1946, to $54,837.47 by July 31, 1949. Utility included the *36 debit balance in Crabbe's drawing account among its savings receivable and treated it as an asset of the corporation. Crabbe issued no notes to the corporation with respect to these withdrawals, nor did he pay interest on such amounts. J. E. Milam, who had acquired 50 per cent of the capital stock of Utility in 1943 for the sum of $3,500, told Crabbe at that time that he desired that Crabbe have a free hand in the management of the business and that he was making his investment solely for the purpose of helping Crabbe out. He stated that he was not concerned with the withdrawals which Crabbe might make. Milam took no part in the management or operation of Utility and never received any dividends or other sums of cash from the corporation. He was not furnished with copies of Utility's annual financial statement, did not examine the income tax returns filed by the corporation, and was not aware of the extent of Crabbe's withdrawals from the corporation The capital account of Utility, as shown on its balance sheet for the fiscal years ended July 31, 1946 through July 31, 1949, was in the amount of $7,000. A major asset of the corporation during these years, according to its books, was *37 the account receivable due from Crabbe. No formal dividends were ever declared or paid by Utility. Set forth below, for the fiscal years ended July 31, 1946 through July 31, 1949, are the balances in its surplus account as recorded on its books, the debit balances in Crabbe's drawing account, and the corrected balances in Utility's surplus account if the amounts charged to Crabbe are treated as dividends and withdrawals of capital rather than loans: Fiscal Year
Surplus Account
Drawing Account
Surplus Account
Ended
(Per Books)
B. F. Crabbe
(As Corrected)
July 31, 1946
$16,356.37
$19,775.26
($ 3,418.89)
July 31, 1947
18,057.63
33,735.88
( 15,678.25)
July 31, 1948
33,047.37
58,557.39
( 25,510.02)
July 31, 1949
14,533.95
54,837.47
( 40,303.52)
Respondent determined that Crabbe had withdrawn $9,183.05 and $11,603.23 from Utility during the calendar years 1946 and 1947, respectively, and that such withdrawals constituted taxable distributions of earnings by the corporation. In addition, he determined that part of the alleged travel expenses received by Crabbe from Utility during the years 1946 and 1947 (see Issue 1, supra,) constituted additional income to Crabbe. The amounts of such additional income were computed *38 by applying the percentages of Utility's claimed travel expenses which were disallowed for its fiscal years ended July 31, 1947 and July 31, 1948 to the amounts withdrawn by Crabbe from Utility as traveling expenses during the calendar years 1946 and 1947, respectively. Such computation resulted in the determination that alleged travel expenses received by Crabbe during 1946 and 1947 constituted taxable distribution of earnings in the amounts of $4,867.12 and $5,085.91, respectively. Respondent further claimed, by amended answer, that legal fees in the amount of $2,000, which were paid by Utility for legal services on Crabbe's behalf (see Issue 4, supra,) constituted an additional taxable distribution of earnings to Crabbe during 1947. At the time the cash withdrawals here in issue were made, Crabbe did not regard such withdrawals as loans giving rise to an unconditional obligation to repay such amounts to the corporation. Opinion Respondent determined that Crabbe received taxable distributions of earnings from Utility during 1946 and 1947 as a result of the large cash withdrawals made by him during those years, the receipt of sums from the corporation for unsubstantiated travel expenses, *39 and the payment of legal fees on his behalf by the corporation. We proceed first to the question of whether the large withdrawals made by Crabbe from the corporation during the years 1946 and 1947 are to be regarded as dividends or, as contended by Crabbe, whether they were, in fact, loans. The issue presented here is primarily one of fact. Harry E. Wiese, 35 B.T.A. 701 (1937), affd. 93 Fed. (2d) 921 (C.A. 8, 1938), certiorari denied 304 U.S. 562 (1938); Victor Shaken, 21 T.C. 785 (1954). Were these withdrawals regarded by both the corporation and its stockholder, Crabbe, as loans at the time they were made, thus giving rise to an obligation to repay, or did they represent dividends within the meaning of section 115(a) of the 1939 Code? That these withdrawals were not in proportion to the stockholdings does not prevent them from being considered as taxable dividends. Roy J. Kinnear, 36 B.T.A. 153 (1937). Nor does the fact that the withdrawals were not shared in by all stockholders and the formalities of a dividend declaration are lacking prevent such withdrawals from being regarded as dividends. Regensburg v. Commissioner, 144 Fed. (2d) 41 (C.A. 2, 1944), certiorari denied *40 323 U.S. 783 (1944). Book entries treating the withdrawals as accounts receivable are not conclusive that a loan was intended, Roy J. Kinnear, supra, nor is the failure of the stockholder to give notes or other evidences of indebtedness to the corporation, or to pay interest on the amounts withdrawn determinative of the factual issue. Victor Shaken, supra.The question of intent, that of the corporation and that of the stockholder making the withdrawals, must be determined after an examination of all the evidence in the record and no one of the aforementioned factors is conclusive evidence that a loan rather than a dividend was intended. In the instant case, Crabbe had complete control over the operation and management of the corporation. The only other major stockholder had given him a free hand both in the conduct of the business and the use of the money in the business. We are here concerned solely with the use made of this latter power. Crabbe appears to have exercised it freely. Finding his salary insufficient for his personal needs, he made continual withdrawals of large sums of money from the corporation. These withdrawals were so substantial in amount that if they are not *41 regarded as loans and, consequently, as assets of the corporation during the years here in issue, the corporation's surplus and capital would be so depleted during such years that its $7,000 capital would have been reduced to $3,581.11 at the end of its fiscal year July 31, 1946, and the corporation would show a deficit in its capital account on July 31, 1949, amounting to $33,303.52. Although entries on the corporation's books treated these withdrawals as accounts receivable, thus showing the corporation to be solvent at all times, we find the balance of the record totally unconvincing as to Crabbe's unconditional intent to repay such sums to Utility. Crabbe appears to have had no other source of income during these years and it does not appear that he could have fully repaid such withdrawals out of his personal assets. Cf. Al Goodman, Inc., 23 T.C. 288 (1954); George P. Marshall, 32 B.T.A. 956 (1935); and Comey & Johnson Co., 8 B.T.A. 52 (1927). It would appear that if Crabbe had any intention to repay the amounts withdrawn by him, such repayments would have to be made from future earnings of the corporation. However, such an intention does not satisfy the requirement for a *42 loan, namely, that there be an unconditional obligation to repay. See William Francis Mercil, 24 T.C. -, filed September 30, 1955, and cases cited therein. A stockholder who withdraws money from his corporation, intending to repay such sums only if, and when, future dividends are issued, cannot be regarded as postponing the declaration of such dividends. Rather, the initial withdrawals must be regarded as the distribution of taxable dividends. Crabbe, himself, may not have regarded these withdrawals as dividends, but having failed to show an unqualified intention to repay, they must be deemed dividends to the extent provided by section 115(a). It is true that Crabbe personally paid substantial amounts of the corporation's obligations during its fiscal year ending July 31, 1947, and during subsequent fiscal years. However, despite credits to his drawing account because of such payments, the debit balance in his account constantly increased during such years. When we regard these withdrawals in what appears to us to be their true light, namely, dividends to the extent of the available surplus and, thereafter, withdrawals of capital or simply withdrawals of amounts belonging to the firm's *43 creditors, then the corporation's balance sheet on July 31, 1947, would show a deficit in its capital account of $8,678.25 and even larger deficits in its capital account during subsequent years. [3] Consequently, such payments cannot be regarded as an attempt to repay loans made from the corporation but rather must be regarded as an attempt by Crabbe to keep the corporation in business by paying creditors amounts which the corporation could not pay because he had withdrawn all of its available funds. Respondent determined that Crabbe's withdrawals amounted to $9,183.05 and $11,603.23 in the calendar years 1946 and 1947, respectively.[4] The record does not indicate the position of the corporation's surplus account at the end of these calendar years, but it does show that the corporation *44 recorded a surplus on its books as of July 31, 1946, in the amount of $16,356.37; $18,057.63 as of July 31, 1947; and $33,047.37 as of July 31, 1948. Crabbe has failed to carry his burden of proving that the corporation's earnings and profits at the end of the calendar years 1946 and 1947 were insufficient to distribute the dividends determined by respondent, and we must accordingly sustain respondent's determination that the corporation had sufficient earnings and profits at the end of each of these calendar years and, therefore, that dividends were received by Crabbe in the amounts determined. S. Schulein Co., 20 B.T.A. 264 (1930). We turn next to respondent's determination that part of the amounts received by Crabbe from the corporation as traveling expenses during 1946 and 1947 were not, in fact, so spent and, therefore, constituted taxable distributions of earnings. As discussed under Issue 1, supra, we have sustained respondent's determination *45 that, for lack of substantiation, only approximately 50, 43, and 41 per cent of the traveling and entertainment expenses claimed by Utility for the three fiscal years here in issue are to be allowed. Respondent has applied the percentage of expenses disallowed to the corporation for its fiscal years ended July 31, 1947, and July 31, 1948, to the amounts withdrawn by Crabbe during his calendar years 1946 and 1947, and has accordingly determined that of the amounts received by him as traveling and entertainment expenses during 1946 and 1947, $4,867.12 and $5,085.91, respectively, were not so spent and are to be regarded as taxable distributions of earnings. As heretofore discussed, there was almost a total lack of supporting evidence on the traveling and entertainment expenditures made by Crabbe on the corporation's behalf. The major portion of the amounts involved were withdrawn from the corporation in the form of checks payable to cash. Further, it appears that Crabbe used part of these amounts to pay for the traveling expenses of his wife when she accompanied him and, in one instance, for the traveling expenses of his brother. Crabbe has failed to carry his burden of proving that *46 such sums were used for corporate rather than personal purposes and that the corporation's earnings and profits at the end of 1946 and 1947 were insufficient to support the distribution of a taxable dividend. We, therefore, sustain respondent's determination that part of the amounts received by Crabbe as traveling expenses during 1946 and 1947 constituted taxable distributions of earnings. Finally, we must decide whether the action of Utility in paying $2,000 in legal expenses on behalf of its president, Crabbe, resulted in the taxable distribution of earnings to Crabbe in 1947. These legal expenses were incurred for the defense of Crabbe against a criminal indictment charging him with conspiracy to defraud the United States and be favored in the sale of surplus Government property. See Issue 3, supra. Crabbe engaged in this conduct, not on behalf of himself, personally, but on behalf of the corporation. The record does not indicate why only Crabbe, individually, was indicted, but it is clear that the actions charged to him in the indictment were performed solely on behalf of the corporation. Since respondent pleaded this issue affirmatively, the burden was upon him to prove not only *47 that the payment of such legal expenses constituted a taxable dividend to Crabbe, but that the corporation had sufficient earnings and profits at the end of 1947 to support the distribution of such a dividend. However, respondent has failed to prove the amount of the corporation's available earnings and profits at the end of 1947 and, consequently, we cannot hold that this payment resulted in a taxable dividend to Crabbe. Issue 8: B. F. Crabbe - Statute of Limitations Findings of Fact and Opinion Crabbe filed his individual income tax return for the taxable year 1946 on March 20, 1947. On or prior to March 3, 1952, Form 872, a consent agreement was executed extending the assessment date to June 30, 1952. The statutory notice of deficiency was mailed on June 27, 1952. Crabbe now contends that the assessment of income tax for that year is barred by the statute of limitations. In his return for 1946, Crabbe reported gross income in the amount of $7,100.94. It is clear that, upon the basis of our holding on Issue 7, supra, Crabbe understated his gross income for the taxable year 1946 by more than 25 per cent. The statute of limitations for the assessment and collection of any deficiency *48 for that year was accordingly extended to March 20, 1952, by virtue of section 275(c) of the 1939 Code. We, therefore, hold that the deficiency notice herein was timely mailed to Crabbe and that the statute of limitations is not a bar to the assessment and collection of the deficiency asserted against him for the taxable year 1946. Decisions will be entered under Rule 50. Footnotes
*. By amended answer, he alleges an additional deficiency of $1,162.40.↩
1. See Revenue Ruling 54-195, 1954-1 C.B. 47↩.
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(f) Losses by Corporations. - In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.↩
3. The corporation's books, on July 31, 1947, listed a capital of $7,000 and a surplus of $18,057.63. However, when we disregard the $33,735.88 balance in Crabbe's drawing account as an asset of the corporation, the surplus account shows a deficit of $15,678.25. Applying such deficit in the surplus account against the $7,000 capital account results in a deficit of $8,678.25 in the capital account on July 31, 1947.↩
4. The record is not clear as to whether these amounts are over and above the salary credited to Crabbe's drawing account for the calendar years 1946 and 1947, but since petitioner makes no argument on this matter, we assume that they were.↩